ZACHERY WARDEN,

    Plaintiff,

    v.                                           Case No. 20-CV-1566

KILOLO KIJAKAZI,
Acting Commissioner of Social Security[1],

    Defendant.

## DECISION AND ORDER

Zachery Warden seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title II claims for disability benefits and childhood disability benefits and his Title XVI claim for Supplemental Security Income benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed and the case is dismissed.

## BACKGROUND

### 1. *Relevant Medical History*

Warden alleges disability based on attention deficit hyperactivity disorder ("ADHD"). Warden began receiving special education services in the area of an emotional/behavioral disability in September 1995. (Tr. 558.) Warden had difficulty accepting suggestions and criticism and would sometime "blow" when things did not go his way. (*Id.*) In approximately April 2001, while in second grade, Warden was diagnosed with ADHD. (*Id.*) When Warden

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner. *See* Fed. R. Civ. P. 25(d).

entered high school, he continued to utilize special education services and was on an individualized education program, or IEP, to address his ADHD and emotional/behavioral disability. (Tr. 560.) At the age of 18 years old, Warden began working with the Wisconsin Department of Workforce Development's Division of Vocational Rehabilitation services ("DVR") to help him find work after graduation. (Tr. 487–88.) At his February 2011 IEP meeting, it was noted that Warden "made a lot of improvements over his high school career" and was "taking care of social situations very well." (Tr. 468.) He was at or above grade level in all academic areas and socially was participating more than seventy-five percent of the time is class discussions and was addressing his concerns appropriately more than seventy-five percent of the time. (*Id.*)

The Wisconsin DVR helped Warden find employment at Hardees. (Tr. 487.) Warden was initially hired on a temporary basis to clean the lobby and eatery area, stock, and wash dishes. (*Id.*) In August 2011, the DVR notes indicated that part-way through Warden's time at Hardees, the district manager cut the restaurant's hours, thus limiting the number of hours the manager could give Warden to one day a week. (Tr. 486.) Other employees suggested Warden could do dishes and make biscuits so he could have additional hours. (*Id.*) Warden indicated that he was hopeful his hours at Hardees would increase over time and when asked by DVR whether he wanted to look for other jobs with more hours Warden declined, noting that he enjoyed his Hardees job. (*Id.*) Warden was permanently hired as a lobby attendant in September 2011, for five hours per week. (*Id.*) The DVR records consistently indicated that Warden got along well with his co-workers and supervisors, that he enjoyed the job, and that he desired to work more hours. (Tr. 485–88.) By November 30, 2011, DVR closed its case file, finding Warden no longer required DVR services. (Tr. 485–86.)

Between June 2016 and May 2019, Warden treated with his family practice doctor, Dr. Michael Pothen. While Dr. Pothen noted in June 2016 that Warden "has difficulty focusing on any one given task" (Tr. 615), Dr. Pothen's records otherwise consistently indicated that Warden did well on his ADHD medication with no side effects and exhibited appropriate speech and behavior. (Tr. 615–28, 719–22.)

Between December 2016 and July 2019, Warden also treated with Dr. Jawad Pervez, D.O. for management of his ADHD medication. In his appointment to establish care, Warden noted having difficulty with sustained attention, made careless mistakes, had trouble listening, had difficulty following through when given directions, failed to finish activities, had difficulty organizing tasks, became easily distracted, and struggled with fidgeting. (Tr. 636.) Despite these initial statements, however, all of Dr. Pervez's subsequent treatment notes indicated that Warden was doing very well on his ADHD medication without side effects and his mental status examinations showed attention span and concentration within normal limits, recent and remote memory intact, normal mood and affect, and no fidgeting. (Tr. 642–43, 648, 651, 656, 659, 664, 667, 672, 675, 680, 682–83, 689, 691–92, 697, 699–700, 724, 727–28, 732, 735–36.) In all of Dr. Pervez's subsequent treatment records, he stated Warden was functioning with "little or no impairment" (Tr. 653, 661, 669, 677, 685, 694, 703, 730, 739), with his most recent record describing Warden's ADHD symptoms as "not active" (Tr. 738).

### 2. *Administrative Procedural History*

Warden filed an application for disability benefits and childhood disability benefits under Title II of the Social Security Act and for SSI benefits under Title XVI of the Act, alleging disability beginning on August 10, 2010, his 18th birthday. (Tr. 324, 331.) Warden alleged disability based on ADHD; GERD; a learning disorder, becoming easily frustrated,

3

overwhelmed, and anxious; difficulty with written instructions; and difficulty performing more than 1-2 step tasks. (Tr. 363.) Warden's applications were denied initially and upon reconsideration. (Tr. 11.) Warden filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on December 17, 2019. (Tr. 30–59.) Warden testified at the hearing, as did his mother, Cheryl Ann Warden, and Carrie Anderson, a vocational expert. (Tr. 31.)

In a written decision issued January 28, 2020, the ALJ found that Warden had the severe impairment of ADHD. (Tr. 14.) The ALJ found that Warden did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 14–16.) The ALJ further found that Warden had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: limited to simple and routine tasks; can maintain concentration for two hour periods (i.e., access to regularly scheduled breaks); limited to occasional interaction with the public; limited to simple work-related decisions; can adapt to changes within a routine work setting; is unable to perform fast-paced production rate work (i.e., assembly line work), but can perform goal orientated work. (Tr. 16–20.)

While Warden had no past relevant work, the ALJ found that given his age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 20–21.) As such, the ALJ found that Warden was not disabled from August 10, 2010, through the date of the decision. (Tr. 21.)

Warden requested review of the ALJ's decision from the Appeals Council. (Tr. 319.) On July 23, 2020, the Appeals Council granted Warden's request, finding that while the ALJ

addressed Warden's applications for childhood disability benefits and SSI, he failed to reference Warden's application for a period of disability and disability insurance benefits. (Tr. 319–20.) On September 16, 2020, however, the Appeals Council adopted the ALJ's findings and made them applicable to all three of Warden's claims. (Tr. 3–5.) Because the Appeals Council's decision is the final decision of the Commissioner, it is the decision subject to Court review. 20 C.F.R. § 404.981. In this case, because the Appeals Council adopted the ALJ's findings, I will review the decision of the ALJ as modified by the Appeals Council's decision. *See Pugh v. Bowen*, 870 F.2d 1271, 1274 n.1 (7th Cir. 1989) ("[B]ecause in this case the Appeals Council explicitly adopted the opinion of the ALJ, we must determine whether substantial evidence supports the ALJ's decision."); *Arbogast v. Bowen*, 860 F.2d 1400, 1402–03 (7th Cir. 1988) ("[I]n this case, the Appeals Council explicitly adopted, as modified, the opinion of the ALJ. Accordingly, we must review the decision of the ALJ as modified by the Appeals Council.").

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions

5

drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2.     *Application to This Case*

Warden alleges the ALJ erred in two principal ways: (1) he improperly discounted Warden's allegations of disabling symptoms based on "innocuous facts" and "normal" mental status findings, neither of which were inconsistent with his allegations and (2) he used an improperly strict standard to evaluate Warden's subjective symptoms. I will address each argument in turn.

#### 2.1    Evaluation of Subjective Symptoms

Warden argues that the ALJ erred by not fully crediting his subjective complaints. The Commissioner's regulations set forth a two-step test for evaluating the credibility of a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. Social Security Ruling ("SSR") 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the

6

symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

### 2.1.1 Consideration of Nonmedical Facts

Warden's argument focuses on one passage in the ALJ's decision. Specifically, in discounting Warden's allegations of disabling symptoms from ADHD, the ALJ considered Warden's hearing testimony that he has some difficulty with memory, needs reminders to do certain tasks, has difficulty following instructions, does not have many friends, experiences anger issues, has difficulty concentrating and focusing, and becomes overwhelmed with changes in routine. (Tr. 18.) The ALJ then stated that despite these assertions, Warden graduated from high school, was able to work with DVR to find a part-time job, and took a trip to Florida with his family to visit friends. (*Id.*) Thus, the ALJ explained that Warden's mental limitations were appropriately accommodated by limiting him to simple and routine tasks, maintaining concentration for 2-hour periods (with access to regularly scheduled breaks), occasional interaction with the public, simple work related decisions, adapt to changes within a routine work setting, and is unable to perform fast paced production rate work (i.e. assembly line work) but can perform goal oriented work. (Tr. 18–19.)

7

Warden acknowledges that he will likely be accused of nit-picking and "plucking out one sentence from the ALJ's decision," but argues that the ALJ assessed Warden's subjective symptoms based solely on the medical records and this one sentence describing three activities. (Pl.'s Br. at 13, Docket # 13.) He argues that these three "innocuous" facts are not inconsistent with his allegedly disabling symptoms. (*Id.* at 9.)

As an initial matter, Warden generally faults the ALJ for relying on *only* the medical records and several of Warden's activities. But an ALJ "is not required to address every piece of evidence or testimony presented" and the Court views "the record as a whole" when determining whether the ALJ's decision is supported by substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Even so, in this case, the ALJ does not simply rely on three "innocuous" facts to discount Warden's allegedly disabling symptoms. Rather, in discounting Warden's allegations, the ALJ relied on the fact that Warden consistently reported to his two treating doctors that his ADHD was well controlled with his medication. (Tr. 17.) He relied on Warden's choice not to engage in group therapy and his mental status examinations showing normal mood/affect, speech, insight, judgment, thought content, memory, and cognition. (Tr. 17.) In addition to this evidence, the ALJ also relied on the three facts in question—high school graduation, working part-time, and travel to Florida— in discounting the disabling symptoms. (Tr. 18.) He also partially relied on the opinions of the state agency consultants. (Tr. 18.) What an ALJ is prohibited from doing is ignoring an entire line of evidence that is contrary to the ruling. *Terry*, 580 F.3d at 477. In this case, however, it is completely unclear what evidence Warden alleges the ALJ failed to consider.

Furthermore, to the extent the ALJ relied on the three stated nonmedical pieces of evidence in discounting Warden's claims, I find no error in the ALJ's decision. As to the fact

Warden graduated high school, he argues that the ALJ did not address the difficulties reflected in his special education records, such as the fact that Warden was in special education for an emotional/behavioral disability, causing him to have outbursts and "crises" necessitating his removal from class. (Pl.'s Br. at 10.) Warden argues that these school records corroborate Warden's claims of having difficulties with others. (*Id.*)

Warden's alleged error is without merit. The ALJ did consider Warden's allegations of difficulties interacting with others. In fact, the ALJ found Warden had moderate limitations in this area. (Tr. 15.) The ALJ accommodated this moderate limitation, however, by limiting him to only occasional interaction with the public. (Tr. 18–19.) This conclusion is well-supported by the record evidence. As Warden neared graduation, his school records showed that he had "very few crises that prevented him from doing well in class" and although he "occasionally will be upset because of remarks by other students," he is "trying to work through his feelings . . . so that it does not develop into a problem." (Tr. 446.) The record showed that Warden made friends at school and acted appropriately with them. (*Id.*) And while working at Hardees, the DVR records show that Warden got along well with both his co-workers and his supervisors. (Tr. 485.) Thus, the ALJ did not err in this regard.

As to Warden's ability to work with DVR to find a part-time job, Warden argues that this fact is not contrary to his asserted level of functioning and thus should not be held against him. (Pl.'s Br. at 11–12.) He argues that the ALJ failed to acknowledge that Warden only worked two five-hour shifts per week. (*Id.*) But the fact Warden was able to successfully work is a relevant factor the ALJ is permitted to consider. Again, the record shows that while working, Warden got along well with both his co-workers and his supervisors. This indeed contradicts Warden's stated assertion that work is overwhelming and stressful for him.

Furthermore, the records indicates that Warden's lack of hours at Hardees was not because of his ADHD, but because of limited hours available to him. (Tr. 486.) While Warden testified that he stopped working at Hardees because it was "overwhelming, stressful," he also said that his "rides were inconsistent." (Tr. 36.) As the ALJ stated, by July 2019, his treating doctor, Dr. Pervez, stated that Warden's ADHD symptoms were "not active" and that he was "at goal with current meds." (Tr. 17, 738.) The ALJ also cited Dr. Perez's frequent notations that Warden was functioning with little or no impairment. (Tr. 17, 653, 661, 669, 677, 685, 694, 703, 730, 739.) Again, the ALJ did not err by looking at this fact.

Finally, as to Warden's travel to Florida, he argues that the ALJ failed to explain how travel to Florida was inconsistent with his symptoms and failed to consider the fact that his parents went with him and that he cannot drive. (Pl.'s Br. at 12–13.) Warden is incorrect. The ALJ's opinion is clear that he contrasts Warden's travel to Florida with his family to visit friends with his assertion that he "was alone a lot" in high school and "does not have many friends except some that he has met online who live far away." (Tr. 18.) And the ALJ did not overlook the fact that the travel was with his family. Thus, the ALJ was not incorrect in finding travel to visit friends inconsistent with an assertion of self-isolation. Beyond this piece of evidence, as stated above, the record evidence generally indicates no more than moderate limitations in social interaction. As such, the ALJ did not err in this regard either.

### 2.1.2 Consideration of Mental Status Examinations

Warden further argues that the ALJ erred by discounting his allegations of disabling symptoms based on normal mental status examination findings, specifically: "that the claimant regularly appeared cooperative, engaging, with normal speech, mood/affect, insight, judgment, thought content, memory, and cognition during examinations since his

alleged onset date despite his mental health impairments." (Pl.'s Br. at 13, citing Tr. 17.) Warden argues that these normal mental status findings say "little to nothing about [Warden's] ability to consistently show up for work, stay on task, and maintain pace," nor does it explain how he can function in a full-time, competitive environment. (*Id.* at 15.)

I disagree. To begin, Warden alleges the symptoms preventing him from working are his difficulty concentrating, following instructions, getting stressed, having memory issues, and getting along with others. (Tr. 16.) Warden does not allege difficulties showing up for work and the DVR records do not indicate that Warden failed to show up for work when required, nor do the records show that he failed to attend his scheduled doctor's appointments. And despite no clear evidence Warden struggles with pace, the ALJ still precluded Warden from performing fast-paced production rate work in the RFC. (Tr. 17–18.) Furthermore, Warden's mental status examinations showing that he was always cooperative, engaging, with normal memory, mood/affect, and judgment, does cut against his allegations of disability based on, for example, memory and getting along with others. More importantly, Warden's mental status examinations with Dr. Pervez consistently showed Warden's attention span and concentration within normal limits (Tr. 651, 659, 667, 675, 683, 692, 700, 728, 736), contrary to his assertion that his difficulties following instructions and concentrating are so serious as to be work-preclusive.

The record in this case fully supports the ALJ's finding that Warden is not disabled due to his symptoms from ADHD. Again, Warden's two treating physicians, Drs. Pothen and Pervez, consistently found Warden's ADHD well-controlled on medication. Tellingly, despite Dr. Pervez completing two mental impairment questionnaires opining Warden had marked and extreme limitations in various areas of mental workplace functioning (Tr. 632,

743–44), Warden does not challenge the ALJ's rejection of these opinions. Nor could he. As Warden acknowledges, Dr. Pervez "recorded normal mental status exam findings and reported that Warden had little or no impairment in function." (Pl.'s Br. at 3.) In other words, Dr. Pervez's opinion is wildly inconsistent with his own records and with the records of Dr. Pothen.

Also, Warden's mental status examinations demonstrated normal functioning, most tellingly, with attention span and concentration, to the point that Dr. Pervez's most recent medical records described Warden's ADHD symptoms as "not active." (Tr. 738.) And even Warden's own statements are inconsistent with his allegations of disabling symptoms. In his Adult Function Reports, Warden reports playing video games, watching television, and reading daily (Tr. 352, 390), all activities that require some degree of concentration. He reports getting along "really well" with authority figures and being able to handle minor changes in routine. (Tr. 355, 392.) He states he can follow spoken instructions, and only has difficulty understanding if there is "a ton of instructions being spoken." (Tr. 354.)

However, despite the record showing very minor symptoms and the state agency consultant at the reconsideration level opining only mild limitations in understanding, remembering, or applying information and in adapting or managing oneself, the ALJ assigned Warden greater limitations than those opined based on Warden and his mother's testimony at the hearing. (Tr. 18.) Warden's RFC clearly accounts for Warden's difficulties with attention and concentration by limiting him to simple and routine tasks where he needs to maintain concentration for two hours periods. (Tr. 16.) For his alleged difficulties in getting along with others, the ALJ limited Warden to occasional interaction with the public. And given Warden's statements that he can only handle minor changes in routine, the ALJ limited

12

him to a job with simple work-related decisions where he can adapt to changes within a routine work setting, without having to perform fast-paced production work. (*Id.*) Based on the record evidence, it is entirely unclear what more the ALJ could have done to account for Warden's limitations. The ALJ's decision is well supported by the evidence and will not be reversed on this ground.

### 2.2 Use of Improperly Strict Standard

Finally, Warden argues that the ALJ utilized an improperly strict standard in evaluating Warden's case. (Pl.'s Br. at 15–17.) This argument is a variation of an argument previously considered and rejected by this Court. *See Seibel v. Saul*, No. 19-CV-643, 2020 WL 1812448, at *5 (E.D. Wis. Apr. 8, 2020). In *Seibel*, following a decision from the Northern District of Illinois, *Minger v. Berryhill*, 307 F. Supp. 3d 865 (N.D. Ill. 2018), the plaintiff argued that the ALJ's statement that the claimant's allegations were "not entirely consistent" with the medical evidence meant that the ALJ was using a more rigorous standard than required by the regulation, namely, that "allegations be 'entirely consistent' with the medical and other evidence." *Minger*, 307 F. Supp. 3d at 871. I noted in *Seibel* that other courts agreed with *Minger*'s analysis, including courts in this district. *See Whyte v. Saul*, No. 18-CV-1274, 2019 WL 5541412, *5 (E.D. Wis. Oct. 25, 2019). I rejected *Minger*'s position, however, finding that the ALJ was not creating a more rigorous standard; rather, he was simply swapping the previous "meaningless boilerplate" ALJs used for years (i.e., "not entirely credible") with new language to conform with SSR 16-3p, which speaks in terms of consistency as opposed to credibility. *Seibel*, 2020 WL 1812448, at *5. As such, I found that use of the template, in and of itself, did not require remand, *id.*, and advised plaintiffs "to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision," *id.* at *7.

13

The *Minger* argument eventually made its way to the Seventh Circuit, who has seemingly rejected the notion that it applies a higher evidentiary standard:

> The ALJ found Gedatus's statements about her symptoms to be "not entirely consistent with the medical evidence and other evidence for the reasons explained in this decision." She criticizes the ALJ for applying the wrong standard. She argues the language "are not entirely consistent" means the ALJ required the evidence to be entirely consistent with her claims about her symptoms before he would accept her claims, and did not use the appropriate preponderance-of-the-evidence standard. But we do not read the ALJ's language that way. It is clear to us, given the context, that the ALJ merely used a polite way to say the weight of the evidence did not support all her claims.

*Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Acknowledging this, Warden takes care to clarify that he is *not* challenging the use of the "faulty 'not entirely consistent' boilerplate," in light of the Seventh Circuit's findings. (Pl.'s Br. at 15 n.4.) Rather, he challenges a different statement found in Warden's decision: "The record fails to fully substantiate the claimant's allegations of disabling symptoms." (*Id.* at 15, citing Tr. 17.) Warden argues that unlike the use of "not entirely consistent," the ALJ's statement that the record "fails to fully substantiate" is not boilerplate, is the ALJ's own language, and it "implies the ALJ believed he could justify discrediting Warden's allegations if there was *any* evidence inconsistent with Warden's statements." (*Id.* at 15–16) (emphasis in original).

I am not convinced. First of all, Warden argues that the ALJ's statement was not boilerplate; rather, "[i]s is language that this ALJ and others have used on their own accord." (Pl.'s Reply Br. at 7, Docket # 24.) Given Warden acknowledges that multiple ALJs have used this language, does that not indicate that it is likely boilerplate? Or have all these ALJs simply used the same language on their own accord coincidentally? Warden also cites to several other decisions from this district where the court followed a *Minger*-like argument as to the same "fails to fully substantiate" language. (Pl.'s Reply Br. at 7.) But these decisions

14

were all decided prior to the Seventh Circuit's decision in *Gedatus*, where the court clearly rejected the *Minger* argument and looked instead to how the ALJ's words were used in context.

There is no meaningful distinction between the *Minger* boilerplate argument and the argument advanced here. Both argue that the alleged "higher" standard allows the ALJ to discredit the claimant's allegations if there is *any* evidence inconsistent with the claimant's statements. My statement in *Seibel* applies with as much force in this situation: "Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision." 2020 WL 1812448, at *7. That is consistent with the Seventh Circuit's statement in *Gedatus*, and saves precious time and resources. And in this case, the ALJ's decision is so clearly supported by substantial evidence, this boilerplate argument appears particularly weak and unnecessary.

For all of these reasons, the ALJ's decision is affirmed.

## CONCLUSION

Warden alleges the ALJ erred in denying his disability claims based on ADHD. I find the decision is supported by substantial evidence and affirm. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2022.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge